# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| CECIL JOHNSON and SARAH ANN JOHNSON, individually and on behalf of CECIL JOHNSON, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 3:09-1139 |
| v. | ) | JUDGE ECHOLS |
| | ) | |
| DR. BRUCE LEVY, in his official capacities as the Chief Medical Examiner for the State of Tennessee and Medical Examiner for the Metropolitan Government of Nashville and Davidson County, Tennessee; and RICKY BELL, in his official capacity as Warden, Riverbend Maximum Security Institution, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Twenty-five minutes before the scheduled execution of Cecil Johnson ("Johnson") at 1:00 a.m. on December 2, 2009, this Court entered a Temporary Restraining Order ("TRO") (Docket Entry No. 13) which temporarily prohibited the Defendants from performing an autopsy on Johnson's body. Now pending before the Court is Plaintiffs'[1] request (Docket Entry No. 3) that the Court expand the TRO by preliminarily or permanently enjoining said autopsy.

---

[1]On December 3, 2009, counsel for Johnson filed an "Amendment to Complaint" (Docket Entry No. 15) adding Sarah Ann Johnson ("Mrs. Johnson"), Johnson's wife, next of kin, and executrix of Johnson's will, as a party-Plaintiff pursuant to Rule 20(a)(1) of the Federal Rules of Civil Procedure. Except where specifically noted, "Johnson" and "Plaintiffs" will be used interchangeably in this Memorandum.

1

# I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

Less than six hours before his scheduled execution at 1:00 a.m. on December 2, 2009, Johnson, an inmate at the Riverbend Maximum Security Institution in Nashville, Tennessee, filed a Complaint under 42 U.S.C. § 1983 in this Court, along with a "Motion for Temporary Restraining Order and Preliminary Injunction." (Docket Entry No. 3). By way of those filings, Johnson requested that the Court enjoin Defendants from performing an autopsy on his body after his execution, arguing that such an autopsy would violate his rights under the First Amendment to the United States Constitution. The initial Complaint was filed at 7:27 p.m. on December 1, 2009. Approximately two hours later, Johnson filed an "Amendment to Complaint" (Docket Entry No. 8) in which he added claims that the proposed autopsy would violate his Ninth and Fourteenth Amendment rights under the United States Constitution.

At 12:35 a.m. on December 2, 2009, this Court entered a Temporary Restraining Order ("TRO") (Docket Entry No. 13) which prohibited Defendants from performing an autopsy on Johnson's body pending a hearing on Johnson's request for a preliminary injunction. The Court also set a preliminary injunction hearing for December 10, 2009.

Approximately five minutes after this Court entered its TRO, the United States Supreme Court denied Johnson's Application for Stay of Execution and for Writ of Certiorari, <u>Johnson v. Bredesen, et al.</u>, No. 09-7839 (December 2, 2009), and Johnson's execution by lethal injection proceeded as scheduled. Johnson was pronounced dead at 1:34 a.m. on December 2, 2009.

On the morning of December 2, 2009, this Court rescheduled the hearing on Johnson's request for a preliminary injunction to 10:30 a.m. on December 4, 2009. That evening, counsel for Johnson filed another "Amendment to Complaint" (Docket Entry No. 15) which added Mrs. Johnson as a Plaintiff and added claims that an autopsy on Johnson's body would violate T.C.A. § 4-1-407, T.C.A.

§ 38-7-106, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1, and the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

The Court held on evidentiary hearing on Plaintiffs' request for a preliminary or permanent injunction on December 4, 2009 and directed Defendants to file any response they had to Plaintiffs' filings by the close of business on December 7, 2009. Those responses have been filed. (Docket Entry Nos. 18, 19 & 20).

**A.  Plaintiffs' Contentions and Evidence**

In his original Complaint, Johnson claimed that he had a "sincerely held religious belief" that performing an autopsy would amount to desecration of his body, and he attached a sworn "Notice of Refusal to Perform Autopsy" setting forth that belief. He also filed a sworn declaration from his spiritual advisor, Reverend James Thomas ("Reverend Thomas"), who states Johnson clearly indicated before his death he did not desire an autopsy of his body based upon his religious beliefs and that if the State is allowed to perform an autopsy that "would be a fundamental overturning of his religious conscience and his relationship to Jesus Christ." (Thomas Decl. ¶ 5).

Attached to the second "Amendment to Complaint" is an Affidavit from Mrs. Johnson. In that Affidavit, Mrs. Johnson asserts her husband has been a devout Christian since the early 1980's and that, according to his "strongly held religious faith, he does not want his body desecrated." (Mrs. Johnson Aff. ¶ 3). As recently as this past Thanksgiving day, when he met with his family, Johnson affirmed the belief that an autopsy would violate his religious beliefs because "his body was a temple of his Lord." (Id.). Mrs. Johnson also states that she, too, holds a sincerely held religious belief that a person's body is a temple of the Lord and not to be desecrated. Mrs. Johnson also states Johnson's

daughter does not want her father's body to be autopsied and that the daughter does "not want to risk [Mrs. Johnson's] grandchildren (ages 3 and 6) learning later of this desecration." (Id. ¶¶ 8 & 9).

In her Affidavit, Mrs. Johnson states she witnessed the execution and there is no doubt in her mind her husband's death was caused by the drugs administered to him during the execution. Mrs. Johnson also states she has no intention of filing any claim against anyone concerning the manner in which the execution was carried out and would be "happy to sign" any waiver on such a claim. (Id. ¶¶ 5 & 6).

Plaintiffs have also presented the Affidavit of Joe Louis McGee ("Elder McGee"), an Elder at the Lawrenceburg Seventh Day Adventist Church. In his Affidavit, Elder McGee states that in the early 1980's, while doing prison ministry for his church, he met Johnson. Elder McGee also states that in late 1982 or early 1983, Johnson "was baptized and accepted Jesus Christ as his Lord and Savior." (Elder McGeeAff. ¶ 2). Elder McGee further states that he met with Johnson on 500 to 600 occasions over the past three decades and that Johnson grew spiritually over the years and took extreme pride in his health and body "which he often described as a Temple of the Lord." (Id. ¶ 4).

Finally, Elder McGee states Johnson told him before the execution he did not want his body to be autopsied because it would violate "God's law" and that he (Elder McGee) believes Johnson's "religious belief concerning the sanctity of his body was sincere." (Id. ¶¶ 5-6).

At the evidentiary hearing on December 4, 2009, Reverend Thomas, Mrs. Johnson, and Elder McGee each took the witness stand and affirmed that the statements made in their respective Affidavits were true and correct and constituted their testimony in these proceedings. Plaintiffs also

introduced the "Stipulation as to Testimony of Warden Ricky Bell" ("Stipulation") (Pfs. Ex. 1)[2] and the Journal of the Death Watch Supervisor ("Journal") (Pfs. Ex. 2).

In the Stipulation, Warden Bell indicates that the State of Tennessee has "Execution Procedures for Lethal Injection" which is also known as the lethal injection protocol and that, as Warden of Riverbend Maximum Security Institution, he was responsible for following that protocol in the execution of Johnson. In accordance with the protocol, Warden Bell stated he made sure that the chemicals to be used in the procedure were properly acquired, stored, and accounted for.

According to the Journal, three days before the execution, Johnson was placed on Death Watch and confined to a single-person cell where all of his movements and activities were monitored and logged in approximately fifteen minute intervals. According to the Stipulation, Warden Bell was responsible for supervising the personnel who observed Johnson during the Death Watch and also personally observed Johnson on several occasions during the Death Watch. Warden Bell states that Johnson appeared at all times to be in good health. The Journal also indicates that Johnson appeared to be in good health while on Death Watch, that medical personnel visited him several hours before the execution and nothing remarkable was noted, and that nothing untoward happened to Johnson while he was on Death Watch.

The Journal notes that at 1:08 a.m. on December 2, 2009, Johnson was escorted from the Death Watch area by Warden Bell and Correctional Officers and taken to the execution chamber. According to the Stipulation, once Johnson was in the execution chamber, Warden Bell ensured that the IV team established proper lines for the administration of the lethal injection chemicals. Warden

---

[2]During the evidentiary hearing, Plaintiffs moved to "non-suit" Warden Bell. The Court understands this to be Plaintiffs' request that Warden Bell be dismissed from this action and the Court will grant that request.

Bell observed that after the first chemical was injected in accordance with the protocol, Johnson began snoring which indicated to Warden Bell that Johnson was asleep. The other two drugs were then administered and a physician pronounced Johnson dead at 1:34 a.m. The Stipulation concludes with Warden Bell stating that "the events of Cecil Johnson, Jr.'s execution were consistent with the protocols and with a properly functioning lethal injection." (Stipulation ¶ 11).

Based upon this evidence, Plaintiffs assert that Johnson has a sincerely held religious belief regarding the sanctity of his body, that his body is a Temple of the Lord, and that an autopsy would desecrate his body in violation of his religious beliefs. Plaintiffs also submit that the evidence clearly shows that Johnson died from the lethal injection, that they are not in any way contending otherwise, and that they are not challenging the lethal injection process. Given all this, Plaintiffs argue that performing an autopsy in this case would serve no legitimate purpose and would violate sincerely held religious beliefs. Thus, they request that the Court preliminarily or permanently enjoin an autopsy of Johnson's body.

## B. Defendants' Contentions and Evidence

The State takes the position that an autopsy is required in this case under applicable Tennessee law, specifically T.C.A. § 38-7-106(a), and that Defendant Dr. Bruce Levy ("Dr. Levy"), as Chief Medical Examiner for the State of Tennessee and County Medical Examiner for Nashville and Davidson County, has a statutory responsibility in this case to determine the precise cause of death which can only be accomplished through an autopsy. In support of its position, the State offers an Affidavit from Dr. Levy, as well as the testimony of Dr. Amy R. McMaster ("Dr. McMaster"), a physician who is employed as the Deputy Chief Medical Examiner for Davidson County.

In his Affidavit, Dr. Levy states that pursuant to Tennessee law he is required to investigate and perform an autopsy upon the body of any person who dies of unnatural causes in Davidson

County and that a death by execution is an unnatural cause. Dr. Levy also states that the execution of an inmate is a homicide which, itself, is an unnatural death. As for the reasons he needs to perform an autopsy in this case, Dr. Levy states:

> [T]he only way in which I, as the County Medical Examiner, can confirm the prisoner's execution, as the etiologically specific cause of death is to perform an autopsy. Further, the only way in which I can confirm that the execution was carried out according to state law is to perform an autopsy. Without the autopsy, it would be my professional opinion that the cause and manner of death of this prisoner would have to be classified as undetermined.

> [T]he only way in which I, as County Medical Examiner, can determine whether any other event may or may not have contributed to or caused the death of this person is to perform an autopsy. In addition, an autopsy is the only method by which I can determine whether any other event caused harm to this person is to perform an autopsy [sic]. An autopsy is the only way I can rule out any possibility that the state failed to protect the rights of this inmate during incarceration and establish that the execution was carried out in the manner prescribed by law.

(Levy Aff. at ¶ 2).

Dr. McMaster was called during Plaintiffs' case-in-chief and admitted that an examination of bodily fluids, to include blood, vitreous fluid from the eye, urine, and bile, would indicate whether the lethal injection chemicals performed as expected. Drawing blood, vitreous fluid, and urine would not require cutting into the body, but could be done through extraction by needle. However, to examine bile, an incision would be necessary to allow access to the gall bladder.

Dr. McMaster also admitted the medical examiner's office is unaware of any apparent problems with the manner in which the execution took place, that it has no information the protocol was not followed or did not work as intended, or that there is any suggestion the cause of death was anything other than the lethal injection which was administered by the State. She also admitted that a visual examination of Johnson's body showed nothing suspicious.

Nevertheless, Dr. McMaster testified it is the opinion of the medical examiner's office that, pursuant to Tennessee law, an autopsy is necessary in this case for at least a couple of reasons. First, the fact that Warden Bell has stated the lethal injection protocol functioned as expected is not a medical determination as to the cause of death. The medical examiner's office has an independent duty to make the determination as to the cause of death, as well as an independent duty to determine whether the medical evidence shows that the lethal injection protocol was followed.

Second, while it may appear obvious that the cause of death was due to lethal injection, the medical examiner's office needs to rule out the possibility of other causes which may have been a factor in the death of Johnson. In other words, to determine whether Johnson's death was in fact due to "acute combined drug toxicity" as a result of the injection of the three drugs used during execution, the medical examiner needs to at least view the internal organs to make sure that nothing else was going on which contributed to the death.

Dr. McMaster testified that it is the intention of the medical examiner's office to perform a modified autopsy in this case. A modified autopsy, also referred to as an "in situ" autopsy, is different than a full autopsy because the internal organs are examined in place, as opposed to being removed from the body, dissected, examined and weighed, and placed back into the body. Still, a modified autopsy is an invasive procedure because it requires cutting open the torso and skull, and visually examining the organs.[3] This procedure takes approximately forty-five minutes to an hour and, in Dr. McMaster's opinion, is the least intrusive way in which the medical examiner's office can comply with governing law and with the standard of care expected of medical examiners.

_____

[3]For the same reasons, Plaintiffs deem even a modified autopsy to be unacceptable in light of their religious beliefs.

Based upon the evidence, the State does not challenge Plaintiffs' contention that Johnson, as well as his family, hold sincere religious beliefs which would be violated were an autopsy to be performed on Johnson's body. Nevertheless, the State argues that Johnson's Complaint fails to state a claim because T.C.A. § 38-7-106(a), which sets forth the circumstances under which a medical examiner may perform an autopsy, including executed prisoners, is neutral in its religious application and, therefore, an autopsy performed pursuant to the statute does not constitute a violation of Johnson's First Amendment right to freely exercise his religion. The State also argues that Plaintiffs cannot establish a claim under any of the other theories they presents and that their request for injunctive relief is purposely dilatory because they waited until only hours before the scheduled execution to file multiple legal documents seeking relief from this Court.

## II. <u>APPLICATION OF LAW</u>

In deciding whether to grant an injunction pending a trial on the merits, the Court must consider four factors: (1) whether the party seeking injunctive relief has a strong likelihood of prevailing on the merits of the case; (2) whether the moving party will suffer irreparable injury if the injunction is not entered; (3) the potential harm the injunction would cause the opposing party; and (4) the public interest. <u>See</u> <u>Leary v. Daeschner</u>, 228 F.3d 729, 736 (6th Cir. 2000). "'These factors are not prerequisites which must be met, but are interrelated considerations that must be balanced together.'" <u>Northeast Ohio Coalition for Homeless and Service Employees v. Blackwell</u>, 467 F.3d 999, 1009 (6th Cir. 2006)(quoting, <u>Radioactive Material Users, Inc. v. Griepentrog</u>, 945 F.2d 150, 153 (6th Cir. 1991)). "For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer." <u>Id</u>.

## A.  **Likelihood of Success on the Merits**

Plaintiffs have failed to show a strong likelihood of success on the merits under any of the legal theories advanced.

Plaintiffs' primary contention is that, were the Court to allow the medical examiner to conduct an autopsy of the body, Johnson's rights under the free exercise clause of the First Amendment would be violated.  In support of that position, Plaintiffs rely upon Workman v. Levy, 136 F. Supp.2d 899 (M.D. Tenn. 2001)(Workman I), and argue that "this Court enjoined Dr. Levy from performing an autopsy under circumstances identical to those presented here."  Id.

At the time of Judge Campbell's decision in Workman I, the Tennessee statute concerning the medical examiner's authority to conduct autopsies contained no specific provision relating to the autopsy of inmates who are executed by the State.  Indeed, it was the absence of any such specific authority which, at least in part, led Judge Trauger in the later case of Alley v. Levy, 2006 WL 1804605 (M.D. Tenn. 2006) to grant a preliminary injunction against the performance of an autopsy on an executed inmate's body.

Apart from the lack of language in the statute relating to "executed prisoners,"Plaintiffs' reliance upon Workman I is misplaced because Judge Campbell, after an evidentiary hearing, revisited the entire issue in  Workman v. Levy, 2007 WL 1521000 (M.D. Tenn. 2007)(Workman II) and refused to enjoin an autopsy on the body of an executed prisoner named Phillip Workman.  Judge Campbell did so even though the relevant state statute still contained no specific reference to "executed prisoners."  Nevertheless, Judge Campbell held that, based upon the testimony of Dr. Levy, the same county medical examiner who is the Defendant in this case, the exercise of discretion to conduct an autopsy was for a reason other than the religious beliefs or practices of Workman.  Therefore, "application of this discretionary autopsy statute does not implicate free exercise of

10

religious concerns in this case and is not subject to strict scrutiny." Id. at *4. Judge Campbell further found that even if the court applied strict scrutiny, the State had a compelling interest in performing an autopsy:

> Even if the Court applies strict scrutiny, however, Dr. Levy's testimony indicates that the State and Metropolitan governments have a compelling interest in assessing the effects of the lethal injection protocol that has been the subject of widespread constitutional challenge in recent years. While Mr. Workman's religious beliefs are sincere and worthy of consideration, they do not outweigh the medical examiner's interest in confirming that the manner of death complied with the requirements of the law. Philip Workman, moreover, put the issue of the efficacy of the lethal injection protocol in question (Philip Workman v. Governor Phil Bredesen, et al., 3:07-0490). At this time, the least restrictive means of assessing the effects of the lethal injection protocol is an invasive post-mortem examination by Dr. Levy. Accordingly, the Court concludes that the Plaintiffs do not have a strong or substantial likelihood of success on the merits regarding their First Amendment claim.

Id.

Moreover, the legal landscape in Tennessee at the time Judge Campbell and Judge Trauger penned their decisions in Workman I & II and Alley, respectively, has changed significantly. Effective July 1, 2008, the Tennessee statute relating to the conduct of autopsies was amended by the legislature to provide that "a county medical examiner may perform or order an autopsy on the body of any person in a case involving . . . 'executed prisoners.'" Tenn. Code Ann. § 38-7-106(a).[4] Thus, Plaintiffs' free exercise challenge must now be considered in the context of a statute which has been

---

[4]The statute also provides that when the death of a prisoner in state custody is reported under Tenn. Code Ann. § 38-7-108(a), the county medical examiner in the county where the death occurred has a duty to make an immediate investigation of the circumstances of the death. Tenn. Code Ann. § 38-7-109(a)(emphasis added). In the course of such investigation, the "county medical examiner is authorized to remove from the body of the deceased a specimen of blood or other body fluids . . . and to retain such for testing and/or evidence if in the county medical examiner's judgment these procedures are justified in order to complete the county medical examiner's investigation or autopsy." Id.

amended to specifically allow the county medical examiner to conduct the autopsy of an "executed prisoner."

The free exercise clause of the First Amendment, which is applicable to the states through the Fourteenth Amendment, "means, first and foremost, the right to believe and profess whatever religious doctrine one desires." <u>Department of Human Resources of Oregon v. Smith,</u> 494 U.S. 872, 878 (1990). "The First Amendment does not, however, prevent the government from regulating behavior associated with religious beliefs" and "the 'right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" <u>Mount Elliot Cemetery Ass'n v. City of Troy</u>, 171 F.3d 398, 403 (6th Cir. 1999)(quoting, <u>Dept. of Human Resources of Oregon v. Smith</u>, 494 U.S. 872, 879 (1990)).

In this case, there is no indication that the Tennessee law governing autopsies is not neutral, that it is directed against an identifiable suspect class or group, or that it is intended to impinge on anyone's religious beliefs. Instead, it is a law of general applicability and therefore, Johnson's First Amendment Rights are not violated by enforcement of that law, notwithstanding that the statute gives the medical examiner discretion in whether to perform an autopsy. See, <u>Workman II</u>, 2007 WL 1521000 at *4. Therefore, the Court concludes that Plaintiffs fail to show a strong likelihood of success on their First Amendment claim.

In Plaintiffs' second "Amendment to Complaint," they add a claim under RLUIPA and T.C.A. § 4-1-407. So far as relevant, RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
> > (1) is in furtherance of a compelling governmental interest; and

12

> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  T.C.A. § 4-1-407 is similar to the foregoing, albeit broader because it is not limited to institutionalized persons, and provides:

> (c) No government entity shall substantially burden[5] a person's free exercise of religion unless it demonstrates that application of the burden to the person is:
> (1) Essential to further a compelling governmental interest; and
> (2) The least restrictive means of furthering that compelling governmental interest.

T.C.A. § 4-1-407(7)(c).  Under this statute, which became effective on July 1, 2009, the State is required to demonstrate a compelling state interest by clear and convincing evidence.  T.C.A. § 4-1-407(1).

Leaving aside that Plaintiffs did not seek leave to file their second "Amendment to Complaint" as required by Fed. R. Civ. P. 15(a), Plaintiffs have failed to show a strong likelihood of success on either their RLUIPA or their T.C.A. § 4-1-407 claims.

With respect to the RLUIPA claim, the statute begins by providing that "[n]o government shall impose a substantial burden on the religious exercise of a person <u>residing in or confined to an institution</u>[.]"  42 U.S.C. § 2000cc-1(a)(emphasis added).  Here, the request that no autopsy be performed on Johnson's body is not a claim brought against a penal institution or employees thereof, nor is it a claim about the terms and conditions of imprisonment brought by an inmate residing in, or confined to, an institution.  Instead, it is a claim brought to stop a proceeding which is to occur outside of the institutional setting by an independent agency unrelated to the Department of Corrections.  <u>See</u>, <u>Berryman v. Ganholm</u>, 2009 WL 2461099 at *3 (6th Cir. 2009)(collecting cases)(prisoner's request

---

[5]Like RLUIPA, a substantial burden may arise, "even if the burden results from a rule of general applicability."  T.C.A. § 4-1-407(7)(b).

13

for declaratory and injunctive relief under RLUIPA is mooted by transfer to another facility); <u>Gladson v. Iowa Dept. of Corrections</u>, 551 F.3d 825, 835 (8th Cir. 2009)(collecting cases)(a RLUIPA claim is moot where inmate is released from custody or no longer subject to the offending prison policy).

Further, Plaintiffs have not indicated they exhausted administrative remedies.  "[A] prisoner may not sue under RLUIPA without first exhausting all available administrative remedies."  <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 723  n.12 (2005)(citing, 42 U.S.C. § 2000cc-2(e) which provides that nothing in the RLUIPA 'shall be construed to amend or repeal the Prison Litigation Reform Act of 1995").[6]  Exhaustion of administrative remedies applies to claims brought as part of a Section 1983 action.  <u>Scott v. Ambani</u>, 577 F.3d 642, 647 (6th Cir. 2009).  It may very well be that there are no administrative remedies available to challenge the autopsy intended to be performed in this case, but that possibility merely underscores what this Court has already stated: this case does not involve a challenge by one confined in an institution to the policies, procedures, or regulations of that institution which impact upon the inmate's religious beliefs.

Plaintiffs also face significant hurdles with respect to their claim under T.C.A. § 4-1-407. That state statute, which prohibits governmental entities from placing substantial burdens on an individual's religious beliefs,  was enacted after T.C.A. § 38-7-106(a) which, in turn, amended prior Tennessee law to specifically provide that a county medical examiner may perform autopsies on executed prisoners.

Plaintiffs argue that because T.C.A. § 4-1-407 is the more recent law, it should be given precedence.  However, "the legislature is presumed to know of its prior enactments and the state of

---

[6]The Court recognizes that exhaustion of administrative remedies is an affirmative defense which must be raised by Defendants, otherwise it is waived. <u>Jones v. Bock</u>, 549 U.S. 199, 212 (2007). However, given the late filings, Defendants have not been afforded an opportunity to file responsive pleadings prior to this Court's ruling on the request for a preliminary or permanent injunction.

the law when it enacts legislation," <u>Washington v. Robertson County</u>, 29 S.W.3d 466, 473 (Tenn. 2000). Therefore if the legislature intended to abrogate its prior law which allows for autopsies on executed inmates, it could have easily done so. Further, T.C.A. § 38-7-106(a) specifically deals with autopsies on executed prisoners, whereas T.C.A. 4-1-407 is silent on the issue. "Specific statutory provisions . . . will be given effect over conflicting general provisions." <u>Marion County Bd. of Educ. v. Marion County Educ. Ass'n</u>, 86 S.W.3d 202, 212 (Tenn. Ct. App. 2001)(collecting cases).

More fundamentally, Plaintiffs' ability to succeed on the merits of their claim under T.C.A. § 4-1-407 is doubtful because of the remedy they seek – an injunction against a state actor based on alleged violation of a state statute. While "[t]he Eleventh Amendment does not bar an injunction to prohibit a state official from enforcing a state statute that violates the United States Constitution," <u>Creusere v. Weaver</u>, 2009 WL 170667 at *4 (6th Cir. 2009), this Court has already observed that Plaintiffs have failed to show a strong likelihood of success on their claims that the State's compliance with T.C.A. § 38-7-106 would violate their First Amendment rights. By casting their claim as being protected by T.C.A. § 4-1-407, Plaintiffs are asking this Court to order Dr. Levy, the Medical Examiner of the State of Tennessee, to comply with Plaintiffs' interpretation of that state statute. However, absent waiver of Eleventh Amendment immunity, federal courts simply lack the power to order state officials to conform their conduct to state law. <u>See</u>, <u>Pennhurst State School & Hosp. v. Halderman</u>, 465 U.S. 89, 106 (1984).

Plaintiffs also claim that the State has failed to comply with the notice provisions of T.C.A. § 38-7-106. That statute provides that when a medical examiner decides to perform an autopsy on a deceased, "[t]he authority ordering the autopsy shall notify the next of kin about the impending autopsy if the next of kin is known or reasonably ascertainable." T.C.A. § 38-7-106(a). Again, this claim presents Eleventh Amendment immunity issues. Regardless, while there may have been

technical non-compliance with the notice given in this case, Plaintiffs were fully aware that the State intended to perform an autopsy upon Johnson's death as evidenced by the very fact that they filed a Complaint and Motion for TRO and Preliminary Injunction to halt such an autopsy. Moreover, the statute at issue does not provide as a remedy that no autopsy be performed in the absence of giving the specified notice.

Finally, Plaintiffs raise claims under the due process clauses of the Fifth and Fourteenth Amendments, as well as a claim under the Ninth Amendment to the United States Constitution. Despite the fact that it is incumbent upon Plaintiffs to demonstrate a strong likelihood of success on their claims in order to be entitled to injunctive relief, Plaintiffs fail to argue or cite authority which would show entitlement to relief under any of these theories. This Court's independent review shows little likelihood of success on any of those claims.

The due process clause of the Fifth Amendment has no application to this case. That provision applies only to actions of the federal government and does not apply to the actions of state or local governments. See, Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 7 (1st Cir. 2007); Lee v. City of Los Angeles, 250 F.3d 668, 687 (9th Cir. 2001); Morin v. Caire, 77 F.3d 116, 120 (5th Cir. 1996).

The due process clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. "Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." Memphis Light, Gas and Water Div. v. Craft, 436 U.S. 1, 9 (1978). Thus, "[r]esolution of the federal issue begins . . . with a determination of what it is that state law provides." Town of Castle Rock v. Gonzales, 545 U.S. 748, 757 (2005). Here, Plaintiffs point to no substantive interest created by state law which would support their assertion that

an autopsy should not be conducted in this case and, to the contrary, state law specifically allows for an autopsy under the circumstances of this case.

Finally, Plaintiffs are unlikely to prevail on a Ninth Amendment claim. "[T]he ninth amendment does not confer substantive rights in addition to those conferred by other portions of our governing law," but instead "'was added to the Bill of Rights to ensure that the *maxim expressio unius est exclusio alterius* would not be used at a later time to deny fundamental rights merely because they were not specifically enumerated in the Constitution.'" Gibson v. Matthews, 926 F.2d 532, 537 (6th Cir. 1991). The Court is unaware of any fundamental right to be free from an autopsy authorized by statute. See, Workman II, 2007 1521000 at *4 (finding no likelihood of success on condemned inmate's "novel" claim that post-execution autopsy would violate the Ninth Amendment and the due process clause of the Fourteenth Amendment).

**B.  Irreparable Injury to the Plaintiffs**

Plaintiffs have demonstrated the sincerity of their religiously held beliefs relating to the sanctity of the body and the belief that an autopsy would desecrate Johnson's body. Plaintiffs have also demonstrated that they will suffer immediate and irreparable injury, harm, loss or damage if injunctive relief is not granted because if an autopsy is performed, their claim that they have a right to be free from such a proceeding will be a claim without an effective remedy. See, Overstreet v. Lexington-Fayette Urban County, 305 F.3d 566, 578 (6th Cir. 2002)(potential for irreparable harm is present when it is a constitutional right that is not being enjoined and harm is  not fully compensable by monetary damages).

**C.  Potential Harm to the State**

The State has set forth legitimate reasons of the need for an autopsy in this case, including to confirm the cause and manner of death, to determine whether the lethal injection protocol, which is

17

Tennessee's officially designated method of execution, was administered as planned, whether the chemicals had the designed effect on Johnson, whether there is a medical basis to claim the lethal injection protocol cause pain and suffering, whether any other event may or may not have contributed to the cause of death, and to rule out the possibility that the State failed to protect the rights of the inmate in carrying out the death sentence.

The people of the State of Tennessee, through its state legislature, have made clear that autopsies may be performed in certain circumstances, including where the deceased is an executed prisoner. While the decision on whether to perform an autopsy in such circumstances is discretionary, that discretion is placed squarely and solely in the hands of the county medical examiner, not the courts. Dr. McMaster testified it is the normal policy of her office to conduct autopsies after investigation of homicides, even if surviving family members request that an autopsy not be performed because of their or the deceased's religious beliefs or for other reasons. She testified that autopsies in such circumstances are necessary to fulfill the medical examiner's statutory duty to independently determine the cause and manner of death.

In this case, the medical examiner intends to exercise his discretionary duty by performing an "in situ" autopsy, believing that such a modified autopsy is the least restrictive way in which the exact cause of death can be determined and other causes ruled out. It is also the position of the medical examiner's office that such a modified autopsy is the least intrusive way it can fulfill its statutory duties and comply with the applicable professional standard of care. This Court cannot say that this determination is an abuse of the discretion allowed by statute, assuming that the Court even has the power to review that discretion.

Further, the statute allowing for the autopsy of executed inmates presumably was changed in direct response to earlier decisions which were critical of the absence of such language, including

Judge Trauger's decision in <u>Alley</u>.  Regardless of the reason for the statutory change, the statute is a clear expression of the will of the people as expressed by their duly appointed representatives and it would harm the Defendants if they were not allowed to perform their statutory duties.

**D.  The Public Interest**

Dissolving the TRO and declining to issue an injunction prohibiting an autopsy of Johnson's body is in the public interest.  The public has the right to expect that its duly enacted laws will be enforced, at least to the extent that those laws do not violate constitutional rights.  Additionally, the public at large has a right to know whether the executions which are carried out on its behalf are done in a humane way and do not result in the type of cruel and unusual punishment which is contrary to law and not condoned by a civilized society.  Autopsies serve that purpose if for no other reason than they may provide scientific and anecdotal evidence, one way or the other, as to whether inmates suffer during the execution process and, if so, to what extent.  This interest remains even where, as here, the condemned inmate is not challenging the procedures utilized during his execution.

Further, the public has an interest in the orderly administration of justice.  This includes having its courts issue informed decisions, and, where possible, decisions based upon the merits.  <u>See</u>, <u>Krowtoh II LLC v. ExCelsius Intern. Ltd.</u>, 330 Fed. Appx. 530, 535 (6th Cir. 2009)(collecting cases).  Johnson and/or his attorneys deliberately decided to wait until the last minute to file his request for injunctive relief and to add new claims.  While his self-created emergency factored into this Court's entry of the TRO, it is not conduct this Court condones.

This Court has previously disapproved of the tactic, employed with increasing frequency by counsel for death row inmates, of waiting until just before a scheduled execution to begin papering the courts with emergency filings which could have, and should have, been presented earlier.  <u>See</u>, <u>Henley v. Little</u>,  2009 WL 211139 at *6 (M.D. Tenn. 2009).  While <u>Henley</u> was decided in the

context of a challenge to the constitutionality of Tennessee's three-drug lethal injection protocol, the same sort of sentiment was expressed in the context of a late-filed request for injunctive relief seeking to bar the State of Alabama from conducting a post-execution autopsy:

> . . . After coming to the brink of execution on multiple occasions in the recent past without articulating any First Amendment concerns over the prospect of a post-execution autopsy, [plaintiff] suddenly invokes the equitable power of this Court, just two days before the scheduled execution, seeking to restrain the State, without a full hearing on the merits, from performing on autopsy on his body. The timing of this action bears the unmistakable taint of an ambush, an exercise in eleventh-hour gamesmanship with the intent to procure an unfair strategic advantage over defendants . . .

> [Plaintiff] has never offered any explanation for why he could not have initiated this action earlier, in a manner that would have allowed a full airing and comprehensive resolution of his First Amendment claims on the merits in advance of the anticipated autopsy. It is apparent that no valid explanation exists. Thus, [plaintiff] finds himself demanding emergency injunctive relief from this Court because of his own failure to act in a reasonably prompt fashion to vindicate his rights. Stated differently, the alleged irreparable harm that will result if a temporary restraining order is not granted in this case is harm of [Plaintiff's] own creation. Had he not slept on his rights for years, had he not waited until the last possible moment to initiate a § 1983 challenge to the contemplated autopsy, [Plaintiff] would not be facing a situation where the merits of this dispute cannot be fully and finally decided prior to the scheduled autopsy.

Arthur v. Allen, 574 F. Supp.2d 1252, 1254 (S.D. Ala. 2008).

Similarly, in this case, Johnson could have, and should have, brought his present request long ago, either after the statute was amended effective July 1, 2008 or after the Tennessee Supreme Court entered an order on July 29, 2009 which scheduled the execution date for December 2, 2009. Instead, he waited until just hours before his execution was to occur.

Let there be no misunderstanding: this Court stands fully ready, willing and able to address the complaints of all litigants who come before it, including emergency matters. However, a self-created emergency by death penalty litigators "is the very antithesis of the equitable, diligent, good-faith, vigilant conduct required of a litigant seeking equitable relief." Id.

20

### III. CONCLUSION

Based upon the foregoing, Plaintiffs' request for a Preliminary Injunction (Docket Entry No. 3) will be denied and the TRO entered on December 2, 2009 (Docket Entry No. 13) will be dissolved unless Plaintiffs seek and obtain a stay pending appeal. The claims against Defendant Warden Ricky Bell will be dismissed with prejudice.

It is SO ORDERED.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE